UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| UNITED STATES OF AMERICA,<br><br>                                    Plaintiff,<br>v.<br><br>DON EUGENE WHITE,<br><br>                                    Defendant. | Case No. 2:15-cr-00144-KJD-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot. Suppress – Dkt. #14)<br>(Mot. Supplement – Dkt. #29) |
|---|---|

Before the court is Defendant Don Eugene White's ("White") Motion to Suppress Evidence Seized in Violation of the Fourth Amendment (Dkt. #14) which was referred to me for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4. The court has considered the Motion, the government's Response (Dkt. #19), White's Reply (Dkt. #23) and evidence taken at an evidentiary hearing conducted August 31, 2015. On September 1, 2015, Defendant also filed a Supplemental Argument in Support of Suppression of Evidence (Dkt. #29). After the hearing, White sent a letter on September 10, 2015 (Dkt. #22) stating his counsel did a great job at the evidentiary hearing, but stating that he asked his counsel to show the court a video from when his vehicle was first parked at 20:57. The video was submitted as an exhibit and the court also reviewed it from 20:57 at Defendant's request. William Carrico appeared on behalf of the Defendant, and Philip Smith on behalf of the government.

## BACKGROUND

White is charged in an Indictment (Dkt. #1) filed May 26, 2015, with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment arises out of an arrest by Officers Seely and Chard of the Las Vegas Metropolitan Police Department ("LVMPD") on August 15, 2014.

White's written motion to suppress is supported by information contained in discovery produced by the government in this case. Detective Kitchen's arrest report indicates that officers were conducting vehicle registration checks in the area of Flamingo and Boulder Highway in Las Vegas on the night of the arrest. At approximately 9:01 p.m., the officers ran a records check on White's vehicle which allegedly "returned with the registered owner possibly having an active warrant." The officers observed the vehicle pull into a Walgreens parking lot, but did not see anyone get out of the vehicle. The officers drove up and conducted a vehicle stop where a man was standing at a Redbox machine looking at movies. The officers parked their patrol car behind White's car and approached the man at the machine who said he was not associated with the vehicle. The officers then approached White's vehicle and, according to Detective Kitchen's report, the windows were rolled halfway down and a smell of marijuana was coming from inside the vehicle. White was alone in the car sitting in the front passenger seat and was asked to get out of the car. He was escorted away from the vehicle. Officers confirmed that White was not the person associated with the potential active warrant, and had no outstanding warrants within twelve minutes of the initial contact.

However, between 21:14:12, and 21:26:47, Officer Seely reported finding a gun in the driver's side of the vehicle in a search that was conducted after officers confirmed White had no outstanding warrants. At some point during the encounter, a records check was completed indicating White had prior felony convictions. Detective Kitchen obtained a telephonic search warrant to recover the gun, gun accessories, ammunition and White's DNA. The arrest report indicates cocaine was found in a blue case on the front passenger seat during the search after the warrant was obtained. Additionally, after White was arrested and the search was completed, White told officers he had a small amount of cocaine in his sock. No marijuana was recovered from the vehicle or White's person. White was transported from the scene to the Clark County Detention Center where he was booked for felon in possession of a firearm, possession of cocaine, and trafficking in controlled substances. Nine months later, White was indicted on this federal charge.

/ / /

## I. The Parties' Positions.

### A. White's Motion to Suppress.

White seeks to suppress evidence recovered from the vehicle, on his person, and his statements asserting he was illegally stopped without reasonable and articulable suspicion. White also argues that his Fourth Amendment rights were violated by his prolonged detention which exceeded its permissible scope. Additionally, White argues that the telephonic search warrant application contains material omissions and misrepresentations which require suppression. Specifically, Detective Kitchen misrepresented that at the time officers made contact with White, there were no other occupants in the vehicle, they did not see anyone else get out of the vehicle, and did not know how White got from the driver's seat to the passenger seat. White claims that by the time the warrant was applied for, officers had already contacted Heidi Gill who confirmed to officers that she had been driving the car, yet the affidavit made no mention of Ms. Gill or the officers' contact with her in Kitchen's warrant application. Because the firearm was found under the driver's seat, Detective Kitchen's representation that White was driving the car and had moved to the passenger seat made it seem more likely that the firearm belonged to White and that he moved to the passenger seat to deceive the officers.

The warrant application also represented that police made contact with White because his plate came back as a possible "DONS 5 priority hit." However, the application omitted the fact that by the time the search that uncovered the firearm was initiated, officers knew that Mr. White did not have any warrants and was not the suspect they believed him to be. The application also stated that when officers approached the vehicle, the windows were rolled halfway down and the odor of marijuana was emitted from the window. However, security video footage from the Walgreen's store proves this was a material misrepresentation. In addition, Detective Kitchen omitted the fact that White denied smoking marijuana in the car and that, during the initial search of the vehicle, no marijuana was discovered. This demonstrates Detective Kitchen was attempting to justify the legality of the initial search based on the alleged smell of marijuana. The legality of the initial search was material to the judge's probable cause determination. If the judge had known the windows were only rolled down after officers asked them to be rolled

down, that White denied smoking marijuana, and no marijuana was discovered during the initial search, it might have impacted her decision to grant the warrant. White also claims that there are a number of inconsistencies between Detective Kitchen's arrest report and his warrant application.

White also asks that the court suppress any incriminating statements he made at 10:55 p.m. These statements were made after White had been in custody for nearly two hours, his car had been searched and the firearm and drugs discovered, a search warrant had been obtained for his DNA, and the driver of the vehicle had given a statement inculpating him, which were all unconstitutionally obtained in violation of his Fourth Amendment rights. Additionally, under the totality of the circumstances, his statements were not voluntarily given and should, therefore, be suppressed.

**B. The Government's Opposition**.

The government opposes the motion asserting that LVMPD officers Seely and Chard conducted a vehicle stop on a Dodge Charger because, after running the vehicle's license plate, the registered owner possibly had an outstanding arrest warrant issued by the Nevada Department of Parole and Probation. After the officers learned the vehicle was registered to a Don Eugene White, Officer Seely ran a records check on him at 20:59, at the beginning of the encounter and discovered that White was a convicted felon and had two active warrants for his arrest out of North Las Vegas Municipal Court and Las Vegas Justice Court. A copy of the records request made by Officer Seely is attached as Exhibit 1 to the government's response. Exhibit 1 reflects that Seely ran a SCOPE, NCIC and DMV check on White at the beginning of the encounter, and received the requested information pertaining to White at 21:01. At the time of the stop, White was the only occupant of the vehicle and was sitting in the front passenger seat. According to the government, Chard approached the driver's side of the vehicle and asked White to roll down the front driver's window to speak with him. The front passenger window was already rolled down. White complied and rolled the front driver's window partially down. When he did so, Chard immediately smelled marijuana coming from the car. Chard went to the

driver's side and made contact with White and asked White to step out of the vehicle. White was detained pending further investigation.

Chard asked White for permission to search the car, although Chard intended to search the car anyway based on probable cause for a warrantless automobile search because he smelled marijuana. The government claims that before the automobile was searched, White volunteered that he had cocaine in his sock. The cocaine was retrieved and White was placed in front of the patrol cruiser while Chard searched the car. Minutes into the search, a firearm was discovered underneath the front floor mat on the driver's side of the vehicle. At this point, the search was "frozen" pending the arrival of a firearms detective and White was placed under arrest.

Firearms detective Kitchen arrived at the scene and obtained a search warrant to retrieve the firearm. White was arrested by LVMPD, and on May 26, 2015, a federal grand jury indicted him for felon in possession of a firearm.

Under these circumstances, the government argues that the police had a legitimate reason to conduct a check on White's vehicle. The government also argues that the duration of the stop was not unconstitutionally expanded. The police lawfully searched the vehicle without a search warrant because they had probable cause based on detecting an odor of marijuana emanating from the vehicle. Additionally, White's admission that he had cocaine in his sock after Officer Chard smelled marijuana provided another independent basis to search the vehicle. The government concedes that the Walgreens video attached as Exhibit G to White's motion indicates the front driver's window appears to be rolled up when the police cruiser first approaches. However, Officer Chard asked White to roll the front driver's window down when he first made contact with White, and the passenger window was already rolled down. Even if officers only smelled the odor of marijuana on White's person after he got out of the vehicle, there would still be probable cause to search the vehicle for marijuana because he had just been inside of it.

The government's opposition argues White's motion attempts to improperly rely on the CAD [computer assisted dispatch] log as evidence of the precise time an event occurred during the stop. The CAD log is not a "live log" of the events of a traffic stop and is only updated when

an officer provides information over the radio to the dispatch center. This does not always happen immediately and is often done after some time has elapsed. Defendant's own taped statement attached as Exhibit D to his motion admits that the police officer who approached him immediately told him that he smelled like "weed" while he was still seated in the vehicle. This is consistent with the officers smelling marijuana coming from the car immediately, not fifteen minutes after the Defendant got out of the car. Additionally, White's tape-recorded statement indicates White responded to the officer's statement that he smelled marijuana by stating, "sorry about that, mm, I wasn't smoking in the car or nothing like that." White's statement also indicates he admitted that the odor of marijuana was probably lingering on him because he had "dreads and it sticks." White also stated that he was in the passenger seat because he was high and a little bit drunk. All of these statements substantiate the patrol officers' account that they detected marijuana emanating from White's vehicle.

Finally, the government represents that it will not rely on the search warrant obtained by Detective Kitchen in this case to support this prosecution or the search. Therefore, a *Franks* hearing is not necessary. The government is relying on the officers' probable cause to conduct a search without a warrant. Here, the police already knew White was a convicted felon prior to discovering the firearm. Therefore, when the firearm was discovered, they knew it was contraband and subject to lawful seizure. The purpose of the exclusionary rule is to deter Fourth Amendment violations. In this case, the firearm would have been inevitably discovered in the search of the vehicle based on probable cause and exclusion is therefore not required.

**C. White's Reply**.

White replies that the government's response is striking in its factual inconsistencies and shifting justifications for the initial stop and search of White's vehicle. The government's opposition also omits critical facts. The opposition bears "no resemblance to the facts alleged in Kitchen's police report" and warrant application provided in discovery. The government's recitation of the facts admits that Detective Kitchen lied in his police report and search warrant application in several material respects. The opposition states, for the first time, that White had outstanding misdemeanor warrants that were allegedly active at the time of the stop. If true,

1  Detective Kitchen would have mentioned this fact in his application for a search warrant, but did
2  not. Additionally, the CAD log contains no mention of misdemeanor warrants, and instead
3  suggests that Seely and Chard confirmed that White had no outstanding warrants. White bailed
4  out of jail the day after his arrest with no mention of misdemeanor warrants, and would not have
5  been released from custody without being required to appear to resolve these warrants.

6  The government should not be permitted to "disavow its reliance on the search warrant"
7  given its admissions regarding material misstatements and omissions made by Detective Kitchen.
8  Police did not seize the gun until after the search warrant was obtained. Kitchen's application
9  represented that the premises had been "frozen" by officers and that the warrant was necessary to
10 retrieve the firearm. The fact that the officers found it necessary to seek a search warrant in the
11 first place indicates that they knew they lacked probable cause to seize the gun absent a warrant.
12 White therefore persists in his request for a *Franks* hearing. Alternatively, if the court accepts
13 the government's disavowal of the search warrant, the government should be bound by its
14 disavowal and forced to acquiesce in the exclusion of the evidence in the event this court and the
15 district judge conclude that officers lacked probable cause to stop White and/or search his
16 vehicle. That is, the government should be precluded from reasserting reliance on the search
17 warrant if it loses on the issue of probable cause.

18 Even if the court determines a *Franks* hearing is not necessary, Kitchen's material
19 misrepresentations and omissions in his application for the search warrant are still highly
20 relevant to his credibility and the validity of the search in this case. The government's reliance
21 on the inevitable discovery doctrine is misplaced because it is never applied to excuse the failure
22 to obtain a search warrant where police had probable cause, but simply did not attempt to obtain
23 one. It is unbelievable that officers standing outside the driver's side of the vehicle with the
24 driver's window rolled down halfway could smell marijuana lingering on White's person with
25 White seated on the passenger side of the vehicle. White disputes that he volunteered he had
26 cocaine in his sock before the vehicle was searched. Rather, White's statement clearly told
27 Detective Bien that after the officers searched the car he told them he had coke too and gave it to
28 the officers. Finally, to the extent the government relies on White's statements concerning the

7

smell of marijuana lingering on his body, his statement was the direct result of the illegal search and seizure and should be suppressed.

**II.     The Evidentiary Hearing.**

The court set this matter for an evidentiary hearing to hear testimony about the initial justification for the stop and the government's claim that probable cause supported a warrantless search in this case. The court denied the Defendant's request for a *Franks* hearing as the government affirmatively represented that it was not relying upon the telephonic search warrant Detective Kitchen obtained after patrol officers stopped White and conducted a search of his vehicle. Having disavowed reliance on the search warrant, the government will be foreclosed from relying on the search warrant to justify the search of the vehicle and any evidence recovered from it. The government will also be precluded from using DNA recovered from White pursuant to that warrant.

At the evidentiary hearing, the government called the two patrol officers involved in the initial stop, Devon Chard and Adam Seely; Detective Frank Bien, the officer who took White's recorded statement; and Michael Loving, an LVMPD officer assigned to an ATF task force who received a request from AUSA Smith to compile a computer history of the records checks for the stop in this case. The defense called Larry Ehrich, a shift leader/manager at the Walgreens store on 4895 Boulder Highway, and White.

At the conclusion of the evidentiary hearing, defense counsel requested a continuance to call Detective Kitchen as a witness asserting his testimony was needed because he was the officer who physically retrieved the firearm involved in this case. Additionally, defense counsel argued his credibility was at issue because his report and search warrant application was at odds with the testimony of officers Chard and Seely. Although Detective Kitchen's credibility may well be at issue if he testifies at trial, the court found that his testimony was not needed on the issues presented in the motion to suppress given the governments abandonment of any reliance on the search warrant Kitchen obtained. Defense counsel made an offer of proof concerning why his testimony should be allowed to bring out inconsistencies between his report and warrant application and the testimony of the two patrol officers.

Defense counsel had the opportunity to question Chard and Seely about any inconsistencies between their testimony and Detective Kitchen's report and search warrant application, but did not do so with one exception. The court therefore denied the defense request for a continuation of the hearing to call Detective Kitchen.

Defense counsel also requested an opportunity to consider whether supplemental points and authorities were required because of the testimony at the evidentiary hearing. The court set the matter for a status hearing the following day. Counsel for Defendant filed a Supplemental Argument in Support of Suppression of Evidence (Dkt. #29). The supplemental argument addressed testimony offered by Officer Seely that suggested the government may be intending to rely on the inventory exception to the search warrant requirement. At the September 1, 2015 status conference, government counsel confirmed that the government was not relying on the inventory exception and that the sole justification for this search was based on the automobile exception to the search warrant requirement.

## DISCUSSION

### I.  The Traffic Stop

The government does not claim that White's encounter with Officers Chard and Seely was consensual. It is undisputed that White was detained from the point of his initial contact with the officers in the parking lot of the Walgreens on the night of his arrest.

A temporary detention of an individual during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). The Fourth Amendment requires reasonable suspicion to justify a traffic stop. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). The reasonable suspicion standard takes into account "the totality of the circumstances—the whole picture." *Id.,* at 417. This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

9

The court finds Officers Chard and Seely had reasonable suspicion to conduct a traffic stop and investigatory detention of White on the night of his arrest. Both officers testified that they were on patrol in the area of Flamingo and Boulder Highway in Las Vegas on August 15, 2014, running license plates in a known violent crime area when they observed White's Dodge Charger. The vehicle was observed driving northbound on Boulder Highway and entered a Walgreens parking lot and parked. Seely ran the plates on the vehicle through Nevada DMV and received information that the plates were associated with an individual with an outstanding DONS [Dangerous Offender Notification System] active parole and probation warrant. The patrol vehicle turned around and initiated a traffic stop to investigate. Neither officer saw anyone get out of the vehicle, but observed a man standing in front of the vehicle at a Redbox movie machine. The man at the Redbox machine said he had no connection with the Charger. The officers then made contact with White who was sitting in the passenger seat of the car.

Officer Chard approached the Charger on the driver's seat window. White partially rolled down the driver's seat window. Chard immediately smelled marijuana coming from the vehicle. He approached the passenger side and asked White to step out. White complied and was brought to the front of the patrol vehicle while the officers investigated whether he was the individual with the outstanding DONS warrant. Both Chard and White testified that White was placed in handcuffs as soon as he stepped out of the vehicle. Records checks were conducted and the officers confirmed that White was not the person associated with the DONS warrant. White testified he was told "sorry for the inconvenience, you're not the person we're looking for."

Exhibits produced by both sides during the evidentiary hearing substantiated the testimony of Officers Chard and Seely that the license plates on White's vehicle were associated with both Eddie Johnson and White. Eddie Johnson had an outstanding DONS warrant for a probation violation. Criminal records queries of state and national data bases also reflected that both men were associated with the same social security number. In short, the court finds the officers had reasonable suspicion to conduct an investigatory detention of White based on the

information they had from conducting a license plate check that linked the vehicle with an individual having an outstanding felony warrant.

**II.    Duration and Scope of the Traffic Stop**

White argues his Fourth Amendment rights were violated by his prolonged detention which exceeded the permissible scope of the initial stop.

The Supreme Court has held that police contact during an investigatory detention must be reasonably related to the circumstances that initially justified the detention. *United States v. Sharpe*, 470 U.S. 675, 682 (1985). An investigative detention must be tailored to its underlying justification and may last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 560 U.S. 491, 500 (1983). However, it is objectively reasonable under the Fourth Amendment to check a motorist's driver's license and registration. *Id*. General questioning during a traffic stop concerning the starting point, destination and general travel plans are also objectively reasonable. *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001). Police are not required to have reasonable suspicion to ask questions beyond the scope of the initial traffic stop. *See United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007); *United States v. Turbin*, 517 F.3d 1097, 1100 (9th Cir. 2008); *United States v. Mendez*, 476 F.3d 1077, 1079-80 (9th Cir. 2007).

Exhibits introduced during the evidentiary hearing establish the license plates on the vehicle were run at 20:59:02, and criminal history records checks were requested for outstanding warrants for both Johnson and White at 21:01:26. The officers confirmed White was not the person associated with the DONS felony warrant within a few minutes of their initial contact with him. However, exhibits introduced at the evidentiary hearing establish that the officers were aware as early as 21:02:37 that White was the registered owner of the vehicle and had outstanding misdemeanor warrants. White's written motion disputes this. However, the CAD report admitted as Government's Exhibit 1 contains an entry at 21:02:37 that White was the registered owner of the vehicle as was "440, a wanted person." Additionally, government's Exhibit 5 substantiated the officers' testimony that White had outstanding misdemeanor warrants

1  out of North Las Vegas and Las Vegas. A request for outstanding warrants was made at
2  21:01:26.

3  After the officers confirmed that White was not the individual with the outstanding
4  DONS felony warrant, White was asked for permission to search his vehicle. Chard and White
5  both testified that White refused to consent. Both White and Chard testified that when White
6  refused to consent, Chard told White he was going to search the vehicle anyway. Chard testified
7  he believed he had probable cause to search the vehicle without a warrant based on smelling
8  marijuana.

9  The court finds that the duration and scope of the initial stop did not violate White's
10 Fourth Amendment rights. The officers quickly confirmed that he was not the individual
11 associated with the felony warrant, but knew he had outstanding misdemeanor warrants. White
12 testified that he had been smoking marijuana and that marijuana and cigarette smoke linger in his
13 dreadlocks. He testified that when he got out of the vehicle, the officer immediately stated he
14 smelled like "weed". White testified he apologized for that, but told the officer he had not been
15 smoking marijuana in the car. White also testified that when the officer initially approached on
16 the driver's side of his vehicle, he was sitting on the passenger side with the driver's side
17 window rolled up. White testified that he leaned over to partially roll down the driver's side
18 window coming within four to five feet of the officer outside the car. White told the court that
19 he believed the officer could smell marijuana from his hair after he got out of the vehicle, but did
20 not believe the officer could smell marijuana coming out of the vehicle.

21 The court found Officer Chard credible that he could smell the odor of marijuana coming
22 out of the vehicle when White partially rolled down the driver's side window. The CAD report
23 marked and admitted as government's Exhibit 1 reflects that one of the officers notified dispatch
24 at 21:14:12 that White was not the same individual wanted on the DONS warrant, but "smells
25 like 446/Marijuana". This was approximately thirteen minutes after the initial stop. The CAD
26 report is not a contemporaneous account of when events occur during a traffic stop. Rather, it
27 reports when an officer calls information back to dispatch.

28

The court generally found White credible. However, he was clearly impaired that night. White testified that he was nodding off in the passenger seat when Officer Seely approached the car on the driver's side. Both Chard and Seely testified that Chard approached White's vehicle on the driver's side. White testified he asked Gill to drive his car that night because he was not feeling well. He had been at a gathering where he had been smoking marijuana and drank more than usual. White's tape-recorded statement to Detective Bien indicates that when the officers approached the vehicle, he rolled down the window and told the officers he was waiting on his girl. "They, like, You smell like weed." His tape-recorded statement indicates the officers told him he smelled like weed **before** he stepped out of the vehicle and was asked for his identification. *See* government's Exhibit 6, page 3 of White's tape-recorded statement. Chard began his search of White's car and a call was made to dispatch that a gun was recovered approximately 26 minutes after the initial stop. Under these circumstances, the court finds the duration and scope of the stop were reasonable and did not violate White's Fourth Amendment rights.

**III.    The Automobile Search**.

In *Carroll v. United States, 267* U.S. 132 (1925), the Supreme Court held that the Fourth Amendment does not require a search warrant to search an automobile if the officers have probable cause to believe the vehicle contains contraband. The rationale for the automobile exception to the search warrant requirement is based on the inherent mobility of vehicles, and the recognition that individuals have a reduced expectation of privacy in their automobiles. *See, e.g., United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) (stating "the automobile exception is justified by the exigency created by the inherent mobility of vehicles as well as the relatively minimal expectation of privacy that exists with respect to automobiles.") The automobile exception to the search warrant requirement applies whether or not the car's owner or driver has already been taken into custody or the risk of the inherent mobility of the automobile has been eliminated. *Id.* As long as police have probable cause to believe that the vehicle contains evidence of a crime, the automobile exception to the warrant applies. *Id.,* citing *United States v.*

1  *Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010).  The probable cause determination is based on a
2  totality of the circumstances.  *Id.*

3        The Ninth Circuit has held that detecting the odor of marijuana emanating from a vehicle
4  is sufficient to establish probable cause for to search the vehicle.  *United States v. Garcia-*
5  *Rodriguez*, 558 F.2d 956, 964 (9th Cir. 1977).  The court found Officer Chard credible that when
6  White partially rolled down the driver's side window, he smelled the odor of marijuana coming
7  from the car as soon as White partially rolled down the window on the driver's side. The court
8  believed White that he had not been smoking marijuana in the vehicle, but had been smoking
9  marijuana earlier.  However, White acknowledged that the odor clung to his hair.  White's own
10 tape recorded statement indicates he was questioned about smelling like marijuana before he was
11 asked to get out of the vehicle.   Chard had probable cause to conduct a warrantless search of the
12 vehicle for drugs because he could smell marijuana.

13     **IV.**    **White's Statements**.

14       The government has the burden of proving, by a preponderance of the evidence, whether
15 a confession is voluntary.  *See Lego v. Twomley,* 404 U.S. 477, 489 (1972).  The government
16 must also establish, by a preponderance of the evidence, that a defendant waived his protection
17 against self-incrimination under *Miranda.  Colorado v. Connelly*, 479 U.S. 157, 158 (1986)/

18     **A. The Requirement for *Miranda* Warnings.**

19     *Miranda* warnings are necessary when a suspect in custody is interrogated by police.  *See*
20 *Thompson v. Keohane,* 516 U.S. 99, 102 (1995).  In *Rhode Island v. Innis*, 446 U.S. 291 (1980),
21 the Supreme Court defined interrogation as "express questioning or its functional equivalent."
22 446 U.S. at 300-01.  The Supreme Court and courts of appeal have repeatedly emphasized that
23 many types of questions are not considered interrogation and do not require *Miranda* warnings.
24 For example, questions asked of a motorist temporarily detained in a traffic stop do not require
25 *Miranda* warnings.  *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States*
26 *v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).  Asking a suspect questions regarding general
27 biographical information is not interrogation.  *United States v. Foster*, 227 F.3d 1096, 1103 (9th
28 Cir. 2000).  White does not claim that he should have received Miranda warnings before his tape

1 recorded statement was taken by Detective Bien, or deny that Miranda warnings were
2 administered by Detective Bien. Rather, he claims his statements should be suppressed because
3 they we were tainted by earlier Fourth Amendment violations, and not voluntary under the
4 totality of the circumstances.

5 A valid waiver of *Miranda* rights depends upon the "totality of the circumstances
6 including the background, experience, and conduct of defendant." *United States v. Garibay,* 143
7 F.3d 534, 536 (9th Cir. Cal. 1009) (citing *United States v. Bernard S.,* 795 F.2d 749, 751 (9th
8 Cir. 1986)).

9 There is a distinction between a claim that a *Miranda* waiver is not voluntary and a claim
10 that a *Miranda* waiver was not knowing and intelligent. The voluntariness of a waiver has
11 always depended on the absence of police overreaching. *See Connelly,* 479 U.S. at 170.
12 Although courts often merge the two-pronged analysis, the components should not be conflated.
13 *See Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008). First, a valid *Miranda* waiver requires a
14 showing that it was voluntary and the product of a free and deliberate choice rather than the
15 product of intimidation, coercion, or deception. Second, a valid *Miranda* waiver must have been
16 made with a full awareness of both the nature of the right being abandoned and the consequences
17 of the decision to abandon it. *See United States v. Frank*, 956 F.2d 872, 877 (9th Cir.1992).
18 Only if the "totality of the circumstances surrounding the interrogation" reveals both an
19 uncoerced choice and the requisite level of comprehension may a court conclude that *Miranda*
20 rights have been waived. *Id.* at 877.

21 The tape recorded statement indicates Miranda warnings were given and waived. The
22 government has met its burden of showing that White received and waived his Miranda rights.

23 **B. Voluntariness**.

24 A statement is voluntary where it is "the product of a rational intellect and free will."
25 *See United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (*citing Blackburn v.*
26 *Alabama*, 361 U.S. 199, 208 (1960)). In examining the voluntariness of a confession, the
27 court must consider "whether, under the totality of the circumstances, the challenged
28 confession was obtained in a manner compatible with the requirements of the Constitution."

*See Derrick*, 924 F.2d at 817. In addition, the Supreme Court has determined that coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *See Connelly*, 479 U.S. at 167. It is the government's burden to prove that a confession was voluntary by a preponderance of the evidence. *See United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)); *Connelly*, 479 U.S. at 168.

To determine whether a confession is voluntary, the court applies a totality of the circumstances test. *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The court determines whether, "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion, or by improper inducement so that the suspect's will was overborne." *Id*. In assessing the voluntariness of a confession, the court considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Gifferson v. United States*, 530 U.S. 428, 434 (2000). White testified and did not claim he was coerced, intimidated or deceived. White did not testify that he did not understand his rights or that he felt he had no other choice but to confess. The government met its burden of showing the statement was voluntary.

## **CONCLUSION**

The officers had reasonable suspicion to conduct a traffic stop on the night of White's arrest. The duration and scope of the traffic stop were expanded after officers confirmed that White was not the individual wanted for the felony warrant they were initially investigating but had outstanding misdemeanor warrants. The officers detected the odor of marijuana emanating from White and/or his vehicle as soon as White partially rolled down the window on the driver's side when Chard approached. The odor of marijuana gave officers probable cause to conduct a warrantless search of the vehicle. Finally, the government has met its burden of establishing that White received and waived *Miranda* warnings, and that White's tape-recorded statement was voluntary.

For these reasons,

///

///

**IT IS RECOMMENDED** that White's Motion to Suppress (Dkt. #14) and Supplemental Argument in Support of Suppression of Evidence (Dkt. #29) be **DENIED.**

DATED this 9th day of October, 2015.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE